UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
Case No. 2:20-cv-00511-SPC-MRM

DELROY A. CHAMBERS, JR.,

    Plaintiff,

v.

SCHIFF REALTY, INC.,

    Defendant.
_____/

**FIRST AMENDED COMPLAINT**
and
**JURY DEMAND**

Plaintiff, Delroy A. Chambers, Jr., by and through his undersigned attorneys, files this First Amended Complaint for injunctive and declaratory relief, damages, costs, and attorneys' fees against Defendant, Schiff Realty, Inc., and as good grounds states as follows:

**PRELIMINARY STATEMENT**

1. This action arises as a result of discriminatory actions perpetrated by Defendant, whose principal place of business is in Cape Coral, Florida.

2. Specifically, Defendant has violated the Fair Housing Act by, among other things: (1) refusing to negotiate, and otherwise making unavailable and denying a home at 1030 S. 62nd Avenue, Unit B, Hollywood, FL 33023 (the "Dwelling") to Mr. Chambers because of race (42 U.S.C. § 3604(a)); and (2) providing false information regarding the availability of the Dwelling to Mr. Chambers, because of race, and misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available, because of race (42 U.S.C. § 3604(d)).

## JURISDICTION AND VENUE

3. Jurisdiction is invoked pursuant to 42 U.S.C. § 3613(a), in that Plaintiff asserts his claims of housing discrimination in a civil action, and also pursuant to 28 U.S.C. §§ 1331, 2201 and 1343(a)(4), in that this is a civil action seeking to redress the deprivation of the right to fair housing secured to Plaintiff by the Fair Housing Act.

4. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiff seeks permanent injunctive relief pursuant to Rule 65, Federal Rules of Civil Procedure.

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c) in that Defendant's principal place of business is in this district.

## PARTIES

6. Plaintiff, Delroy A. Chambers, Jr., is a Black male that serves as a fair housing tester who seeks to enforce fair housing laws so that people are protected from discriminatory housing practices. Mr. Chambers attempts to accomplish these goals by engaging in testing for fair housing violations and pursuing enforcement of meritorious claims, among other things. In this capacity, Mr. Chambers poses as a renter or purchaser for the purpose of collecting evidence of discriminatory housing practices, without intent to rent or purchase a home. At all relevant times, Mr. Chambers was acting in this capacity as a tester when he conducted an investigation into the discriminatory actions perpetuated by Defendant.

7. As a fair housing tester and advocate dedicated to advancing the rights of those historically discriminated against, Mr. Chambers attempts to locate housing providers and advertisers in order to test their compliance with various fair housing laws. Mr. Chambers conducts such testing efforts consistent with the guidance and instructions outlined by the U.S.

Department of Housing and Urban Development (HUD), housing advocacy groups, and established case law.

8. Mr. Chambers is deeply committed to fair housing and the goals of the Fair Housing Act. Mr. Chambers was and continues to be adversely affected by the acts, omissions, policies, and practices of the Defendant.

9. Defendant, Schiff Realty, Inc., is a Florida Profit Corporation that is engaged in the business of real estate and is comprised of licensed real estate professionals, including real estate sales associate Carlos Florez, who was an employee of Defendant Schiff Realty, Inc., at all relevant times.

## FACTUAL ALLEGATIONS

10. While investigating discrimination in the housing market in April 2020, Mr. Chambers encountered an advertisement for the Dwelling. The advertisement stated, among other things:

> **Requirements for qualification:**
>
> 1. No evictions, **no criminal record** and no collections on credit report. $45 **background check** application per applicant.
> 2. Have funds ready to move in. Total: $2,560. (First month $980 + last month $980 + security deposit $600.)
> 3. Have a job and/ or proof of funds.
>
> If you qualify, let me know so we can set up an appointment to show.

(emphasis added).

11. As such, the advertisement clearly stated that the Dwelling was subject to a policy in which both (1) every prospective tenant was required to undergo a background check; and (2) any prospective tenant whose required background check revealed any criminal record would fail

to meet the "requirements for qualification" to rent the Dwelling, and would not even be allowed to be shown, much less rent, the Dwelling.

12. The advertisement also indicated that the listing agent was Carlos Florez, an employee of Defendant, who is and was at all relevant times registered and listed as an active Real Estate Sales Associate for Defendant with the Florida Department of Business and Professional Regulation. *See* Exhibit 1, Related License Information for Carlos Florez.

13. As part of Mr. Chambers's fair housing testing efforts described above, Mr. Chambers, posing as a potential renter, attempted to negotiate for the rental of the Dwelling with Defendant by confirming the availability of the Dwelling, and sent a text message to the phone number listed on the advertisement.

14. Defendant, through its employee, Carlos Florez, responded by confirming the availability of the Dwelling. Unprompted, Defendant, through its employee Carlos Florez, then restated the "requirements for qualification" in order to be shown and rent the Dwelling, including Defendant's policy that (1) every prospective tenant was required to undergo a background check; and (2) any prospective tenant whose required background check revealed any criminal record would fail to meet the "requirements for qualification" to rent the Dwelling, and would not be allowed to be shown, much less rent, the Dwelling.

15. Mr. Chambers continued the test by asking Mr. Florez for additional details regarding the "no criminal record" policy, attempting to confirm whether any criminal record would result in a denial of the Dwelling.

16. In response, Mr. Florez stated that it "depends on what your criminal report says," indicating to Mr. Chambers that a criminal record might not disqualify a prospective tenant if that criminal record did not appear on the report generated by Defendant's required background

check. As such, this communication is consistent with the policy as clearly stated by the advertisement and by Mr. Florez's prior communication, i.e., that (1) every prospective tenant was required to undergo a background check; and (2) any prospective tenant whose required background check revealed any criminal record would fail to meet the "requirements for qualification" to rent the Dwelling, and would not be allowed to be shown, much less rent, the Dwelling.

17. Mr. Chambers responded by indicating that he had a felony arrest in 2013, and provided details regarding the arrest.

18. In response, Mr. Florez did not ask whether the arrest resulted in a conviction or convictions, and instead stated that Mr. Chambers's arrest history might disqualify him. Again, this communication is consistent with the policy as clearly stated by the advertisement and by Mr. Florez's prior communication, i.e., that (1) every prospective tenant was required to undergo a background check; and (2) any prospective tenant whose required background check revealed any criminal record would fail to meet the "requirements for qualification" to rent the Dwelling, and would not be allowed to be shown, much less rent, the Dwelling. In other words, if Mr. Chambers's background check did not reveal the arrest history mentioned, Mr. Chambers might not be automatically disqualified from being shown and renting the Dwelling.

19. Mr. Chambers continued the test and asked if Mr. Florez could check to confirm whether his arrest history would disqualify him.

20. Mr. Florez agreed to check, and indicated he would get back to Mr. Chambers after speaking with the "managers." Mr. Florez did not indicate whether the "managers" referenced were Mr. Florez's employers at Defendant Schiff Realty, Inc., or some other "managers" associated with the Dwelling itself, such as those belonging to a homeowners

association or management company.  Either interpretation, however, supported Mr. Chambers's belief that Mr. Florez was acting in his capacity as a licensed real estate agent employed by Defendant, Schiff Realty, Inc., at all relevant times.

21.     When Mr. Chambers had still not received any response from Mr. Florez or any other agent employed by Defendant by the next day, Mr. Chambers followed up by text message to the same phone number.  In response, Defendant, through its employee Carlos Florez, indicated that the Dwelling was now rented, and was no longer available for Mr. Chambers to view or rent.  Mr. Chambers asked Defendant, through its employee Carlos Florez, if it had any other similar homes, and it did not respond.

22.     Mr. Chambers became suspect of the sudden change in availability of the Dwelling and abrupt cessation of all negotiation and communication, and wondered whether the Dwelling had really been rented, or whether Defendant was simply refusing to negotiate with him based on its "no criminal record" policy, and had provided him with false information regarding the availability of the Dwelling in lieu of directly communicating a discriminatory denial.

23.     In order to test his suspicions, Mr. Chambers continued his investigation by sending Defendant a text message from a different phone number and inquiring whether the Dwelling was available to rent.

24.     Defendant, through its employee Carlos Florez, immediately responded to the new phone number and confirmed that that Dwelling _was_ in fact available for rent.  Unprompted, Defendant again provided Mr. Chambers with a date that the Dwelling was available for a viewing, and then re-stated the same requirements and qualifications in order to be shown and rent the Dwelling, including the policy that (1) every prospective tenant was required to undergo

a background check; and (2) any prospective tenant whose required background check revealed any criminal record would fail to meet the "requirements for qualification" to rent the Dwelling, and would not be allowed to be shown, much less rent, the Dwelling.

25. This communication confirmed that Defendant, through its employee Carlos Florez, had not only ceased negotiating with Mr. Chambers, and otherwise made the Dwelling unavailable and denied the Dwelling to him based on its "no criminal record" policy, but also that Defendant had provided false information regarding the availability of the Dwelling to Mr. Chambers, because of Defendant's "no criminal record" policy and only after learning of Mr. Chambers's criminal record, and had blatantly misrepresented to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available.

26. Mr. Chambers's suspicions were later further confirmed when Mr. Chambers noticed that Defendant, through its employee Carlos Florez, was continuing to advertise the Dwelling on multiple internet websites, all of which included the same policy as clearly stated by the original advertisement viewed by Mr. Chambers and as confirmed by Mr. Florez's prior communications, i.e., that (1) every prospective tenant was required to undergo a background check; and (2) any prospective tenant whose required background check revealed any criminal record would fail to meet the "requirements for qualification" to rent the Dwelling, and would not be allowed to be shown, much less rent, the Dwelling.

27. Mr. Chambers also later noted that Defendant, through its employee Carlos Florez, had at least one other dwelling in a different city, also located in Broward County, listed for rent on various internet websites, which similarly included a stated policy that (1) every prospective tenant was required to undergo a background check; and (2) any prospective tenant whose required background check revealed any criminal record would not be allowed to be

shown, much less rent, the dwelling, suggesting that the "no criminal record" policy at issue stems from Defendant, and not the individual dwellings themselves.

28. In sum, the "no criminal record" policy is a blanket prohibition serving to deny the Dwelling and other housing to Mr. Chambers and all prospective tenants who have any criminal record, including any arrest or conviction, that appears on the required background check report.

29. Such actions and statements serve to discourage Mr. Chambers from applying, inspecting and renting the Dwelling; and restrict the choices of Mr. Chambers by word or conduct in connection with seeking, negotiating for, renting the Dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development. As such, these actions constitute efforts to deprive Mr. Chambers of housing opportunities.

30. HUD has found that "where a policy or practice that restricts access to housing on the basis of criminal record has a disparate impact on individuals of a particular race … such policy or practice is unlawful under the Fair Housing Act if it is not necessary to serve a substantial, legitimate, nondiscriminatory interest of the housing provider." *See* HUD, "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" (April 4, 2016).

31. According to recent local, regional, and national data; media, academic and governmental studies; and HUD findings; including, but not limited to, data from the U.S. Census Bureau, the Florida Department of Law Enforcement, the Federal Bureau of Investigation, the U.S. Department of Justice, and Florida's Offender Based Transaction System, Black people are arrested, convicted, and imprisoned at vastly disproportional rates in Florida

and the country as a whole, as well as in Broward County, Florida, where the Dwelling is located.

32. For instance, this data demonstrates that in 2018, Black people were arrested, with respect to felonies, at a rate more than double their proportion of the general population nationwide, comprising 27.4% of arrestees (all offenses, all states), despite only constituting 13.4% of the nationwide population. By comparison, White people were arrested, with respect to felonies, at a rate below their proportion of the general population, comprising 69% of arrestees (all offenses, all states), while comprising a greater proportion (76.5%) of the general population.

33. These disproportionate rates are even more pronounced when limited to the State of Florida and Broward County, Florida where the Dwelling is located. In the State of Florida during the same timeframe, Black people comprised 34.5% of all felony arrestees, despite only constituting 16.9% of the State's population. Comparatively, White people in the State of Florida were arrested, with respect to felonies, at a rate below their proportion of the general population, comprising 64.6% of all felony arrestees statewide, despite comprising 77.3% of their respective populations. In Broward County, Black people comprised 51.2% of all arrestees in 2019, despite only constituting 28.5% of the County's population. Comparatively, White people in Broward County, were arrested, with respect to all arrestees, at a rate below their proportion of the general population, comprising 47.5% of all arrestees, despite comprising 61.2% of Broward County's population.

34. The same racial disparities are seen with regards to rates of conviction and incarceration. In 2009, nearly half (45%) of all defendants convicted of a felony in the 75 largest counties nationwide, including Broward County, Florida, were Black, again vastly

disproportionate of the general population. Similarly, with regards to incarceration, in 2018, Black people made up approximately 34% of the country's total prison and jail population (sentenced prisoners under jurisdiction of state or federal correctional authorities), but only roughly 13% of the nationwide population. In other words, Black people were incarcerated at a rate more than two and a half times their proportion of the general population. For Black males, in particular, the imprisonment rate of Black males in 2018 was 5.8 times that of White males.

35. Black people in Florida are more likely to be convicted of a felony than similarly situated White people, even after taking into account racially disparate arrest rates. After controlling for different arrest rates between White people and Black people, Black people are still 35% more likely to be convicted of a felony or misdemeanor than White people who have similar socioeconomic status, live in areas with similar crime rates, and have similar criminal records. Black people are 11% more likely to be convicted of a felony than White people with these similar characteristics.

36. In sum, Black people are arrested, convicted and imprisoned at much higher rates than White people in Broward County, Florida, Florida, as a whole, and the United States. As such, Defendant's "no criminal record" policy, which was the basis for Defendant's refusal to negotiate with Mr. Chambers, making the Dwelling unavailable to Mr. Chambers and denying it to him, and the reason for Defendant's provision of false information to Mr. Chambers regarding the availability of the Dwelling and Defendant's misrepresentation to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available, actually and predictably results in a disparate impact to Black people and therefore impacts and disadvantages Black people at significantly higher rates than White people, which in turn,

reduces the availably of housing for Mr. Chambers and other Black people, as compared to White people.

37. HUD has found that "[a] housing provider with a policy or practice of excluding individuals because of one or more prior arrests (without any conviction) cannot satisfy its burden of showing that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest." *Id.*

38. HUD has further found that in order to satisfy its burden "a housing provider must show that its policy accurately distinguishes between criminal conduct that indicates a demonstrable risk to resident safety and/or property and criminal conduct that does not."

39. HUD has further found that no substantial, legitimate, nondiscriminatory interest can be served where "[a] housing provider … imposes a blanket prohibition on any person with any conviction record – no matter … what the underlying conduct entailed, or what the convicted person has done since then." *Id.*

40. As such, Defendant's actions, through its employee Carlos Florez, in (1) refusing to negotiate with Mr. Chambers, and otherwise making the Dwelling unavailable and denying the Dwelling to him based on its "no criminal record" policy, and (2) providing false information regarding the availability of the Dwelling to Mr. Chambers, because of Defendant's "no criminal record" policy and only after learning of Mr. Chambers's arrest record, and blatantly misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available, are unlawful under the Fair Housing Act, as they have a disparate impact on Black people, and fail to serve a substantial, legitimate, nondiscriminatory interest of the housing provider.

41. Mr. Chambers was angered and insulted that Defendant, through its employee Carlos Florez, was refusing to negotiate with Mr. Chambers, making the Dwelling unavailable to Mr. Chambers and denying it to him, and misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available, based on the "no criminal record" policy, which is a blanket prohibition serving to deny the Dwelling and other housing to Mr. Chambers and all prospective tenants who have any criminal record, including any arrest or conviction, that appears on the required background check report.

42. As a Black person who has been the subject of discrimination throughout his life, Mr. Chambers is particularly sensitive to discriminatory practices. As such, Mr. Chambers was insulted and emotionally distressed by being subjected to discriminatory housing policies by Defendant and its employee.

43. Mr. Chambers was and is saddened, angered, and insulted by the fact that the Defendant, through its employee, was refusing to negotiate with Mr. Chambers, making the Dwelling unavailable to Mr. Chambers and denying it to him, and misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available, based on a "no criminal record" policy that has a discriminatory impact and serves no substantial, legitimate, nondiscriminatory interest. Mr. Chambers has spent a significant amount of time thinking about what occurred and all the other Black people who either may have had housing made unavailable to them or had the availability of housing misrepresented to them by Defendant, based on a "no criminal record" policy, which is a blanket prohibition serving to deny the Dwelling and other housing to Mr. Chambers and all prospective tenants who have any criminal record, including any arrest or conviction, that appears on the required background check report.

44. Defendant's unlawful conduct proximately caused Mr. Chambers to suffer the aforementioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing.

45. Consistent with his fair housing testing efforts, Mr. Chambers has a practice of continuing to monitor and test those entities and individuals found to have been discriminating. To those ends, Mr. Chambers has and will continue monitoring Defendant and its agents in order to determine its ongoing compliance with the Fair Housing Act, and will continue to do so throughout the pendency of this matter and after its conclusion.

## COUNT 1:
## VIOLATION OF THE FAIR HOUSING ACT

46. Plaintiff repeats and realleges paragraphs 1 through 45 as if fully set forth herein.

47. This Count 1 is brought by Plaintiff against the Defendant, Schiff Realty, Inc.

48. Defendant is liable to Plaintiff for all injuries caused by the Fair Housing Act violations committed by Defendant, and its agents.

49. Defendant Schiff Realty, Inc. authorized Mr. Florez to act for it when he committed the Fair Housing Act violations alleged herein. Mr. Florez accepted the undertaking of acting on behalf of Defendant Schiff Realty, Inc. when he committed the Fair Housing Act violations alleged herein. Defendant Schiff Realty, Inc. had control over Mr. Florez when he committed the Fair Housing Act violations alleged herein.

50. In light of the aforementioned factual allegations, statistical data, and HUD findings:

    a. Defendant's actions in refusing to negotiate and otherwise making unavailable and denying the Dwelling; and misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental

when the Dwelling was in fact so available, because of the challenged no criminal record policy, are arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

b. there is a robust causal link between Defendant's actions in refusing to negotiate and otherwise making unavailable and denying the Dwelling; and misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available, because of the challenged no criminal record policy, that has a disparate impact on Black people, as the no criminal record policy is the direct cause of the discriminatory effect;

c. the disparity caused by Defendant's actions in refusing to negotiate and otherwise making unavailable and denying the Dwelling; and misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available, because of the challenged no criminal record policy, has an adverse effect on Black people;

d. the disparity caused by Defendant's actions in refusing to negotiate and otherwise making unavailable and denying the Dwelling; and misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available because of the challenged no criminal record policy, is significant; and

      e. there is a direct link between the disparate impact and Mr. Chambers's injury.

51. As such, Defendant has violated the Fair Housing Act by, among other things: (1) refusing to negotiate with Mr. Chambers, and otherwise making the Dwelling unavailable and denying the Dwelling to him based on its "no criminal record" policy, and (2) providing false information regarding the availability of the Dwelling to Mr. Chambers, because of Defendant's "no criminal record" policy, and blatantly misrepresenting to Mr. Chambers that the Dwelling was not available for inspection or rental when the Dwelling was in fact so available, because of race.

52. A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.

53. As a result of Defendant's discriminatory conduct - committed despite being engaged in the business of real estate, coupled with Plaintiff's ongoing monitoring efforts - Plaintiff has suffered, is continuing to suffer, and will in the future suffer irreparable loss and injury and a real and immediate threat of future discrimination by Defendant.

54. Defendant's unlawful conduct and actions constitute direct evidence of discrimination and proximately caused Plaintiff's damages as described above.

55. In engaging in this unlawful conduct described above, Defendant acted recklessly or intentionally. This is evidenced, in part, by the fact that Defendant is engaged in the real estate business, and despite that fact, chose to engage in unlawful discrimination.

56. As a tester who has been treated in a discriminatory fashion by Defendant, Mr. Chambers has suffered an injury in precisely the form the Fair Housing Act was intended to guard against, and therefore he has standing to maintain his claims under the Act's provisions.

57. Accordingly, Plaintiff is aggrieved by Defendant's discriminatory actions in violation of the Fair Housing Act.

WHEREFORE, Plaintiff respectfully requests that the Court:

A. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the Fair Housing Act;

B. enter a permanent injunction enjoining Defendant, its successors, and its servants, agents and employees, and all those acting in concert with it, from promoting, furthering, or enforcing any housing requirement policies that include blanket prohibitions serving to deny housing to prospective tenants who have any criminal record, including any arrest or conviction, that appears on the required background check, which actually or predictably result in a disparate impact on Black persons, regardless of the wishes of its clients and/or rules, bylaws, or other governing documents of any related associations;

C. award compensatory damages to Plaintiff against Defendant, to compensate Plaintiff for, among other things, the emotional distress, anger, insult and injury caused by Defendant's discriminatory actions;

D. award Plaintiff his costs and reasonable attorneys' fees in this action; and

E. award Plaintiff such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b), Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable in this matter.

Respectfully submitted,

Joshua A. Glickman, Esq.
Florida Bar No. 43994
josh@sjlawcollective.com
Shawn A. Heller, Esq.
Florida Bar No. 46346
shawn@sjlawcollective.com

Social Justice Law Collective, PL
974 Howard Avenue
Dunedin, Florida 34698
(202) 709-5744
(866) 893-0416 (Fax)

Attorneys for the Plaintiff

By:  *s/ Shawn A. Heller*
      Shawn A. Heller, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, on this 1st day of September, 2020, which will send a notice of electronic filing to all attorneys of record.

By:  *s/ Shawn A. Heller*
      Shawn A. Heller, Esq.